Karen Hansen **MESSER**, Plaintiff

v.

Lionel R. **MENO**, in his former capacity as the Texas Commissioner of Education, the Texas Education Agency, and Mike Moses as the Texas Commissioner of Education, Defendants.

No. A–95–CA–165–SC.

United States District Court, W.D. Texas, Austin Division.

July 8, 1996.

Joseph Webber, Austin, Texas for plaintiff.

James C. Todd, Assistant Attorney General, Austin, Texas for all defendants.

## MEMORANDUM OPINION

CAPELLE, United States Magistrate Judge.

Before the Court are the following partially dispositive [1] motions, responses, and replies:

1. Defendants' First Motion for Partial Dismissal/Summary Judgment filed July 17, 1995 (Doc. # 17); Plaintiff's Response to Defendants' Motion and attached exhibits filed July 26, 1995 (Doc. # 20); Defendants' Reply in Support of Partial Summary Judgment filed August 23, 1996 (Doc. # 24);

2. Defendants' Second Motion, with Supporting Brief, for Partial Summary Judgment filed December 13, 1995 (Doc.

---

1. Counsel for Defendant represented at a hearing held in this matter that the partial dispositive motions, when added together, address all of the various causes of action in this case. After careful review, the Court agrees.

# 33); Plaintiff's Response to Defendants' Second Motion for Summary Judgment filed December 21, 1995 (Doc. # 36); Defendants' Reply in Support of their Second Motion filed January 17, 1996 (Doc. # 39);

3. Defendants' Third Motion for Partial Summary Judgment filed May 10, 1996 (Doc. # 45);[2] Plaintiff's Response to Defendants' Third Motion for Summary Judgment filed March 8, 1996 (Doc. # 36); and Defendants' Reply filed March 13, 1996 (Doc. # 44).

4. The Court also has before it the letter written by counsel for Defendants on March 20, 1996 with respect to the applicability of the *Hopwood* case to the facts of the case at bar, Defendants' Supplemental Authority filed June 4, 1996 (Doc. # 47), Plaintiff's Supplemental Authority in Opposition submitted June 26, 1996,[3] Defendants' Objections to Plaintiff's Supplemental Authority filed June 27, 1996 (Doc. # 50), and Plaintiff's Third Supplemental Affidavit filed June 27, 1996 (Doc. # 51), as well as the pleadings filed in this cause.

2. Because this third motion exceeded ten (10) pages (as did both of the previous motions), under the Local Rules Defendants were required to obtain permission of the Court prior to the motion being filed. The motion and request to exceed page limits was submitted February 23, 1996. However, the Court did not grant permission to file the motion until May 10, 1996.

The Court is aware that both parties repeatedly requested (and were granted) permission to exceed page limits. While the Court in general routinely grants motions to exceed page limits, the use of successive "partial" motions and requesting permission to exceed the page limits for each of the motions (as well as most of the responses and replies) is disfavored.

3. The Court granted permission to exceed the page limits for this pleading contemporaneous to the issuance of this Opinion.

4. Plaintiff resigned from TEA on March 25, 1996 to accept a higher paid position at the Texas Employment Commission. Plaintiff contends that she resigned because she felt retaliated against and believed her input was no longer valued or desired. Although Plaintiff has left TEA, she indicates that she would return if the Court ordered her promoted to the position of TEA Coordinator and she received a sizable raise.

## I. BACKGROUND

Plaintiff, Karen Hansen Messer, was employed at Defendant Texas Education Agency ("TEA") at the time this suit was filed in state court in January of 1995.[4] Defendants removed this case to federal court on February 23, 1995 based on federal question jurisdiction.

Ms. Messer sues under 42 U.S.C. §§ 1981, 1983, and Title VII[5] for alleged race and sex discrimination at the TEA.[6] After removal, Plaintiff amended her Complaint to also asserts state law claims for breach of contract and claims for actual and punitive damages.[7] Because of the posture of this case, the Court construes the facts, if supported by any evidence, in favor of Plaintiff Messer.

In 1991, Defendant Lionel Meno was appointed Commissioner of the TEA. Commissioner Meno left TEA in March of 1995 and is sued in his official capacity as the former TEA Commissioner.[8] Plaintiff also sues the Texas Education Agency, an agency of the State of Texas. There are no individual defendants in this action.

5. Plaintiff's Original Complaint did not include Title VII causes of action because she had not yet obtained a right-to-sue letter. After her receipt of the right-to sue letter on July 28, 1995, Ms. Messer timely amended her Complaint to add Title VII discrimination and retaliation claims.

6. The Court notes that Plaintiff does not assert a claim for gender discrimination under 42 U.S.C. § 1981. Gender discrimination does not fall within the scope of § 1981. *See Runyon v. McCrary*, 427 U.S. 160, 167, 96 S.Ct. 2586, 2593, 49 L.Ed.2d 415 (1976).

7. Although Plaintiff asserts that "other" TEA employees have also been deprived of their rights, this is not a class action. For that reason Plaintiff lacks standing to allege violations to employees other than herself.

8. Under Federal Rule of Civil Procedure 25(d), Mike Moses, as successor Commissioner to Defendant Meno, should have been fully substituted for Defendant Meno and Defendant Meno should have been dropped as an official capacity defendant. The Court presumes that the present Commissioner, Mike Moses, is the only official capacity defendant for purposes of the availability of prospective injunctive relief.

Plaintiff was employed at TEA from 1978 through 1996 and "rose through the ranks" to her final position as Senior Director of the Budget Management Division, a position she held for six (6) years. At the time of the events giving rise to this suit, senior directors were paid approximately $60,000. The title of "Senior Director" indicates a person who manages one of the larger or more complex TEA divisions.

While at the TEA, Commissioner Meno was apparently committed both to affirmative action and to compliance with [then] Governor Ann Richards' directive that the employees at Texas agencies should, as much as possible, reflect the population of Texas with respect to race, ethnicity, and gender. See, e.g., Plaintiff's Exhibits 43–49. From the evidence submitted by Plaintiff, it is clear that an extensive amount of work was done over the years to create, maintain, and analyze documentation concerning the ethnic and gender makeup of TEA employees and applicants for employment. See Exhibits to Plaintiff's Response to Defendants' First Motion for Summary Judgment, passim.

In furtherance of his commitment to affirmative action, Commissioner Meno hired four new senior directors (who were all minorities) at salaries higher than the salary then paid to Plaintiff as a senior director. Commissioner Meno apparently was proud that his senior directors, both the ones he hired and ones already at TEA, were (at least at one time) all minorities and/or women.

It is uncontested that three of these new directors accepted pay cuts to work at the TEA, while one received a minimal raise. The evidence indicates (and Plaintiff does not dispute) that, at least based on their records, all of the new senior directors were qualified for the position. Plaintiff's assertion is based on her claim that she, too, was entitled to the higher salary and would have received it if she was a minority. Allegedly, after Ms. Messer complained about the salary disparity, Commissioner Meno promised Ms. Messer that her salary would be raised to equal that of the other directors. Although Ms. Messer eventually received a raise, she apparently was still earning approximately $1,000 less annually than some of the other directors.

There is substantial evidence indicating that affirmative action was, at least in the past, a factor not only in recruitment but also in TEA hiring decisions. See e.g. Depositions of Susan Farias and Kristine Hopkins Mohajer Motlagh; see also Plaintiff's Exhibits 43–50, 65, 88, 140, 206. The TEA works under an annual "Affirmative Action Program" ("AAP") which stresses the importance of diversity. (Plaintiff's Exhibits 15–20). The 1993–94 AAP, and prior AAPs, had the stated goal of "achieving workforce diversity consistent with the population." [9] See Plaintiff's Exhibit 20. The 1994–95 AAP alters this goal slightly by stating "the overall objective is to achieve a workforce balanced with a proportionate number of women and minorities in the workforce." See Plaintiff's Exhibit 21. The 1994–1995 AAP and prior AAPs also require that no person should be excluded on the basis of race, gender, age etc. However, under the AAPs, monthly reports are to be created to "monitor utilization." The AAPs also all include extensive gender and ethnic breakdowns of the TEA workforce, both of the entire workforce and by category of position. TEA also forwards "utilization reports" to hiring managers indicating staffing compositions and "deficiencies" in staffing. See Plaintiff's Exhibit 237 attached to Plaintiff's Third Supplemental Affidavit.

Purportedly because of the success of affirmative action at TEA, women comprise approximately sixty percent (60%) of TEA's work force. Plaintiff asserts that this overabundance of women results in discrimination against women because, to achieve parity of genders (as reflected in the population), hiring decisions may be made which disfavor women. Specifically, Plaintiff asserts that women have become an "over-utilized" gender at TEA and thus are less likely to be hired or promoted as compared to men as a result of the "swinging pendulum" of affirmative action.

9. Referred to herein as "parity staffing."

With respect to her race claim, Plaintiff alleges that, because there are more whites at TEA than the average of the Texas population, whites are an "over-utilized" race and also are less likely to be hired or promoted. Plaintiff posits that as a white woman, she is "dually disadvantaged" when compared to a minority man.

Plaintiff alleges that she received less pay than minorities as a result of her gender and race. Plaintiff asserts that in January of 1992 she was not considered for the position of Coordinator because she was a white female (a position filled by Jim Johnson, a black male). Plaintiff also alleges that in December of 1993 (or January of 1994) she was not promoted to the position of "Coordinator of Internal Operations" because she was female (a white male, Bill Monroe, was the successful candidate). Plaintiff additionally asserts that there was a "climate of fear" at TEA in which supervisors were required to make hiring decisions on the basis of race or gender in order to achieve parity staffing regardless of who was best qualified for the position. Plaintiff asserts that as of February of 1996 (more than a year after suit was filed), supervisors were still encouraged to make employment decisions based on the applicant's race and/or gender. *See* Third Supplemental Affidavit of Karen Hanson Messer filed June 27, 1996 (Doc. # 51).

With respect to retaliation, Plaintiff asserts that TEA employees who testified favorably to her were either terminated or were subjected to retaliation and persuaded to quit their employment at the TEA. Plaintiff alleges that her opinions were no longer solicited or respected. Plaintiff also states that the division over which she had supervisory responsibility was reduced by twenty percent (20%) without a concomitant reduction in division responsibilities.

## II. THE MOTIONS, RESPONSES, AND REPLIES

### A. The First Motion for Partial Dismissal or Partial Summary Judgment.[10]

#### 1. Defendants' Motion.

Defendants first move for partial summary judgment on the issue of the facial constitutionality of TEA's Affirmative Action Program. Defendants assert that because the relevant portions of the AAP encourage the provision of equal opportunity only through the expansion of the applicant *pool* and not at the point of the hiring decision, they are race and gender neutral. The AAP indicates that no selection techniques (hiring or promotion decisions) should be used that discriminate on the basis of race, religion, national origin, sex, disability, age, or veteran status. Defendants assert that, as federal contractors, they are required under Executive Order 11246, dated September 24, 1965 (as implemented in 41 C.F.R. part 60 *et seq.*) to have an acceptable affirmative action plan in place. For these reasons, Defendants allege that the AAP is thus facially constitutional.

Defendants continue that dismissal of Plaintiff's sex discrimination claim is appropriate.[11] Defendants allege that because she has not identified any legally cognizable injury, Ms. Messer has failed to state a claim with respect to sex discrimination. Last, Defendants allege that TEA is not subject to suit under 42 U.S.C. §§ 1981 or 1983 and those claims should be dismissed against it both because TEA is not a "person" under § 1983 and because of the bar of Eleventh Amendment immunity.

#### 2. Plaintiff's Response.

Plaintiff identifies a position she would have been appointed to in January of 1992 had she not been a white woman, specifically that of TEA Coordinator. Plaintiff proffers her lengthy affidavit and numerous deposi-

---

10. Because the parties have submitted and the undersigned has considered materials outside of the pleadings, the undersigned treats the Motion to Dismiss/Motions for Partial Summary Judgment as Motions for Partial Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 12(b)(6); *Young v. Biggers*, 938 F.2d 565, 568 (5th Cir.1991).

11. At the time of the filing of this motion, Plaintiff had not yet added her Title VII causes of action. After receiving her right to sue letter on July 28, 1995, Plaintiff timely filed her First Amended Complaint adding a Title VII cause of action. (Doc. # 26).

tions (in their entirety), as well as a large number of documents.

Plaintiff asserts that she can maintain her 42 U.S.C. §§ 1981 and 1983 causes of action against TEA for, at a minimum, prospective injunctive relief, citing *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Plaintiff asserts that because the suit was brought in state court and removed by Defendants to federal court (thus allegedly waiving immunity), the Eleventh Amendment does not bar her claims.

Plaintiff continues that Defendant Meno is a "policymaker" whose official decisions subject TEA to liability under 42 U.S.C. § 1983. For support, Plaintiff cites precedent addressing the liability of counties and municipalities for the decisions of their policymakers.

With respect to the AAP, Plaintiff asserts that the Plan fails to satisfy the strict scrutiny required of affirmative action plans because the AAP was not designed to remedy past discrimination. Plaintiff alleges that the AAP fails to serve a compelling state interest and is not narrowly tailored to further that interest. As such, Plaintiff alleges the Plan, on its face, must fail.

### 3. Defendants' Reply.

Defendants reiterate that Plaintiff has not been the victim of discrimination under any AAP. Defendants state that because the AAP deals with underrepresentation of minorities and women, the statistical underrepresentation of men does not trigger any compensatory measures. Defendants point out that as federal contractors, they are required to have an affirmative action plan. Defendants also allege that a state agency is not a "person" suable under 42 U.S.C. § 1983. Defendant reiterates that TEA encourages minority applications but selects the successful applicant based solely on merit. Defendants state that summary judgment is appropriate on the facial validity of the AAP because it is constitutional on its face.

### B. The Second Motion for Partial Summary Judgment.

#### 1. Defendants' Motion

Defendants next move for partial summary judgment on several issues. Defen-

dants assert that Plaintiff's state law breach of contract claim is barred by Eleventh Amendment and state sovereign immunity. Defendants continue that the challenges for failure to promote Plaintiff in January, 1992 selection and December, 1993 are time-barred and Plaintiff's damages claims against TEA and the official capacity defendants under 42 U.S.C. §§ 1981 and 1983 cannot be maintained. Defendants claim that Plaintiff's claim for punitive damages are not recoverable in the present case and are not available even in breach of contract cases.

Defendants also assert that they had legitimate, non-discriminatory reasons for the selection of Bill Monroe and the hiring of the four minority directors at salaries higher than Plaintiff's. Defendants allege that because the affirmative action plan did not enter into any hiring or promotion decisions affecting Plaintiff, she has no standing to assert the AAP is discriminatory. Defendants also assert that because Plaintiff failed to include the 1992 promotion claim in her EEOC charge, the claim is barred. Last, Defendants claim protection under the "Safe Harbor" provisions of Title VII. Defendants proffer affidavits and depositions in support of the above contentions.

### 2. Plaintiff's Response.

Plaintiff begins by citing numerous cases (from circuits other than the Fifth Circuit) in which it was held that summary judgment is disfavored in employment discrimination cases. Plaintiff asserts that her failure to promote claims are not barred because they are part of a "continuing violation." Plaintiff alleges that because the affirmative action plan was not implemented to remedy the effects of past discrimination, under *Croson* and *Adarand Construction,* the Plan fails.

Plaintiff continues that even though the 1992 claim was not included in her EEOC charge, it is still not barred, because it was within the scope of the EEOC investigation. Plaintiff asserts that, with respect to her 1993 claim, she filed her charge within three hundred (300) days of her notice of the adverse action as required under Title VII.

Substantively, Plaintiff points to the statistical evidence, which she asserts establishes that minorities are "over-utilized" at every level of TEA. Plaintiff alleges that this evidence, combined with proffered anecdotal evidence, is sufficient to survive summary judgment.

### 3. Defendants' Reply.

Defendants assert that most of the evidence proffered by Plaintiff is inadmissible.[12] Defendants cite *Bodenheimer v. PPG Indus. Inc.*, 5 F.3d 955 (5th Cir.1993) for the proposition that summary judgment can be appropriate in employment cases. Defendants argue that Plaintiff has failed to show a continuing violation and thus her 1992 promotion claim is time-barred. Defendants assert that the AAP is constitutional because it, unlike the cases cited by Plaintiff, does not require that minorities and/or women receive preferences in hiring or promotion. Defendants analyze the statistics and assert that they negate Plaintiff's allegations of agency-wide discrimination. Defendants conclude by stating that Plaintiff has failed to disprove Defendants' nondiscriminatory reasons and they are entitled to the Safe Harbor provisions of Title VII and the requirements of Executive Order 11246.

Defendants summarize Plaintiff's discrimination claims as attacking the AAP at three levels: first, a facial attack; second, as applied to selection and promotion decisions agency-wide; and third, as applied against Plaintiff personally in promotion decisions. Defendants assert that the AAP is facially constitutional; Plaintiff lacks standing to challenge its application agency-wide; and

Plaintiff has failed to rebut Defendants' nondiscriminatory reasons for failing to promote her and failed to provide a nexus between the AAP and any promotion decision. As such, Defendants allege that summary judgment is proper.

### C. The Third Motion for Partial Summary Judgment.

#### 1. Defendants' Motion.

Defendants, in their final motion, move for summary judgment on Plaintiff's retaliation cause of action. Defendants assert that although Plaintiff's [former] department was downsized, this was the result of agency-wide reductions in force and not retaliation for any protected activity. Defendants submit that Plaintiff has suffered no adverse employment decision within the coverage of Title VII. Defendants allege that federal court is not the proper forum to "micromanage" the relatively minor complaints which comprise Plaintiff's allegations of retaliation. Defendants assert that the evidence establishes as a matter of law that Plaintiff deserved any disciplinary actions she may have received.

#### 2. Plaintiff's Response.

Plaintiff responds that the evidence raises a fact issue with respect to retaliation. Plaintiff proffers her own affidavit and the affidavits of two former TEA employees whose employment with TEA ended soon after they gave depositions in this case. Plaintiff also proffers the affidavit of TEA former employee Larry Dale Loiselle, former TEA Equal Opportunity Coordinator and author of Plaintiff's Exhibit 65.[13] Mr. Loiselle

---

**12.** In two appendices, Defendants lodge specific objections to the recitations in Plaintiff's affidavit.

**13.** Plaintiff's Exhibit 65 was written by Mr. Loiselle in November of 1991. The memo, which was sent to all hiring managers, states, in part, as follows:

[There is a] goal to ensure that the Agency's hiring and promotion practices produce a workforce that reflects the ethnic and gender diversity of the state's population. An EEO/AA utilization report will be provided to each division director indicating utilization **of protected classes.** If an underutilization exists **in a particular protected class,** every available means will be taken to eliminate this underutilization. (emphasis added)

Attached to the memo is a summary of the accepted procedures for the hiring process. The Attachment states:

The Agency has in place an *Affirmative Action Program and Plan for Equal Employment Opportunity.* Managers should survey their staffing patterns, especially concerning race and sex, when vacancies occur. While persons must ultimately be employed in the basis of job-related criteria, the needs of the unit, which include balanced workforce considerations, should have significant influence on employment decisions ...

It is not required that the most qualified applicant be hired, only that the person hired meet the minimum qualifications set for the position. However, be sure to have a rational

asserts that he was demoted and then reportedly terminated after he questioned the legality of the AAPs. Mr. Loiselle also asserts that the TEA workforce statistics establish that, far from discriminating against minorities, the TEA has favored minorities to the extent that they have become "grossly overutilized" in all categories at TEA, especially at the highest TEA levels.

### 3. Defendants' Reply.

Defendants reply that, with respect to the adverse actions allegedly suffered by the other TEA former employees, Plaintiff lacks standing to complain about those alleged actions. Defendants continue that Plaintiff has not suffered an "adverse employment action" sufficient to constitute "retaliation" under Title VII. Defendants allege that summary judgment on retaliation is proper because there are no disputed issues of material fact and Plaintiff has failed to carry her burden to rebut their proffered legitimate, non-discriminatory reasons for their actions. Defendants proffer an appendix objecting to the allegations contained in the affidavits submitted in Plaintiff's Response.

### D. Supplemental Information.

### 1. Defendants' Supplemental Information.

Defendants proffer a letter brief analyzing this case in connection with the Fifth Circuit Court of Appeals' recent decision in *Hopwood v. State of Texas*, 78 F.3d 932 (5th Cir.1996), *cert. denied*, —— U.S. ——, 116 S.Ct. 2581, 135 L.Ed.2d 1095 (1996). The Court is familiar with and has considered the holding in *Hopwood* in reaching its decision.

Defendants also submitted supplemental authority in support of summary judgment, citing cases released since the original motions were filed. The Court reviewed the cases cited by Defendants in connection with this Opinion. Last, on June 28, 1996, Defen-

dants filed objections to Plaintiff's Third Supplemental Affidavit.

### 2. Plaintiff's Supplemental Information.

Plaintiff filed supplemental authority in opposition to Defendants' Motions on June 26, 1996.[14] Plaintiff proffers a copy of the *Hopwood* case and analyzes its holdings in light of the case at bar. The Court has considered Plaintiff's arguments in reaching its decision. The Court also reviewed Plaintiff's Third Supplemental Affidavit filed June 26, 1996.

## III. STANDARDS OF REVIEW

### A. Summary Judgment.

■ A Court will, on a motion for summary judgment, render judgment if the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Singh v. Shoney's, Inc.*, 64 F.3d 217, 218 (5th Cir.1995); *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991), *cert. denied*, 502 U.S. 1059, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992).

■ In deciding whether to grant summary judgment, the Court views the evidence in the light most favorable to the party opposing summary judgment and indulges all reasonable inferences in favor of that party. The Fifth Circuit has concluded "[t]he standard of review is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the non-moving party based upon the evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir.1990) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). In other words, the Court must decide whether Ms. Messer produced facts which, if believed, would lead a reasonable jury to

---

basis for recommending an applicant with less qualifications than others. Credible reasons for your recommendation become absolutely critical if the person recommended belongs to an over-utilized race and/or gender by occupational category, by division, and by units within in divisions.

Although the Court finds this evidence supports Plaintiff's allegations, there is no factual evidence in the record that TEA has continued to follow

this practice or that this practice adversely affected Plaintiff, nor is there evidence that Meno was ever aware of this memo. The superseding 1994–95 AAP clearly indicates that considerations such as those expressed above should not be included in the hiring decision.

**14.** Permission to file this more than ten page pleading was granted on July 1, 1996.

conclude that it was more likely than not that she was not promoted (and received less salary than comparable minorities) because of her race and gender. *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 994 (5th Cir.1996) (en banc).

Once a movant has come forward with sufficient evidence to support summary judgment, the burden is on the non-movant to "go beyond the pleadings and designate specific facts in the record showing there is a genuine issue for trial." *Wallace v. Texas Tech University,* 80 F.3d 1042, 1047 (5th Cir.1996). "Neither conclusory allegations nor unsubstantiated assertions will satisfy the non-movant's burden." *Id.* "Guesswork and speculation simply cannot serve as a basis for sending a case to a jury." *Brown v. CSC Logic,* 82 F.3d 651, 658 (5th Cir.1996). To the extent facts are undisputed, a Court may resolve a case as a matter of law. *Blackwell v. Barton,* 34 F.3d 298, 301 (5th Cir.1994).

### B. Racial Preferences.

[7, 8] Strict scrutiny is the proper standard for analysis of all racial classifications, whether imposed by a federal, state, or local actor. *Adarand Constructors, Inc. v. Pena,* — U.S. —, 115 S.Ct. 2097, 2112, 132 L.Ed.2d 158 (1995); *Hopwood v. State of Texas,* 78 F.3d 932, 940 (5th Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 2581, 135 L.Ed.2d 1095 (1996). Under the strict scrutiny analysis, a court must ask two questions: (1) Does the racial classification serve a compelling government interest, and (2) is it narrowly tailored to the achievement of that goal? *Adarand,* — U.S. at —, —, 115 S.Ct. at 2111, 2117; *Hopwood,* 78 F.3d at 940. "As the *Adarand* Court emphasized, strict scrutiny ensures that "courts will consistently give racial classifications ... detailed examination both as to ends and as to means." *Adarand,* — U.S. at —, 115

S.Ct. at 2111, 2117; *Hopwood,* 78 F.3d at 940–41.

The *Adarand* Court did not, however, outlaw race-based distinctions. "If race-based action is necessary to further a compelling interest, such action is within constitutional constraints if it satisfies the 'narrow tailoring' test." *Adarand,* — U.S. at —, 115 S.Ct. at 2117.

The *Hopwood* Court did not absolutely bar consideration of race in admissions to publicly funded universities. The Court indicated that the use of other factors (such as economic background) which might correlate with race was constitutional. However, the Court stated that using race as a proxy for an individualized analysis in the selection processes, even for the goal of achieving academic diversity, was improper. The Court concluded that the use of race in admissions to achieve "diversity" was not a compelling state interest. *Hopwood,* 78 F.3d at 945–46. With respect to the foregoing, the Court is mindful of the strict scrutiny required of affirmative actions in the following analysis.

### IV. ANALYSIS

The Court has before it three separate motions for partial summary judgment. The Court believes the most effective way to fully address the issues is by means of Plaintiff's various causes of action.

### A. Plaintiff's Causes of Action Under 42 U.S.C. §§ 1981 and 1983.

1. Plaintiff's Request for Damages.

To recover damages under 42 U.S.C. § 1983, a plaintiff must show that a person, acting under color of state law, deprived the plaintiff of his or her constitutional or federal rights. *Green v. State Bar of Texas,* 27 F.3d 1083, 1087 (5th Cir.1994); *Young v. Austin I.S.D.,* 885 F.Supp. 972, 975 (W.D.Tex.1995).

The Eleventh Amendment divests federal courts of jurisdiction to entertain suits directed against states.[15] *Port Au-*

---

**15.** On its face, the Eleventh Amendment shields the states from suits by non-citizens only, but the Supreme Court early on construed it in light of a broader notion of sovereign immunity implicit in our federal/state scheme so as to prohibit also suits against a state by its own citizens. However-

er, as stated by the Fifth Circuit, "a gaping hole in the shield of sovereign immunity" is the doctrine of *Ex Parte Young.* This doctrine holds that acts by state officials which are contrary to federal law cannot have been authorized or ratified by the state; and suits seeking to enjoin such

*thority Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 304, 110 S.Ct. 1868, 1871, 109 L.Ed.2d 264 (1990). The Eleventh Amendment may not be evaded by suing state agencies or state employees in their official capacity, because such an indirect pleading remains in essence a claim upon the state treasury. *Green,* 27 F.3d at 1087. It is well established that state agencies and their official capacity employees are not "persons" subject to liability for damages under 42 U.S.C. § 1983. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 70–71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989). Because it is a state agency, TEA cannot be held liable under 42 U.S.C. § 1983. *Port Auth. Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 304, 110 S.Ct. 1868, 1871, 109 L.Ed.2d 264 (1990).

Plaintiff's citation to cases invoking liability for policymakers for municipalities and counties is simply incorrect, because those cases deal with *subsidiaries of the state,* not the state itself. *See, e.g., Monell v. Department of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978) (A municipality does not incur liability under § 1983 "unless action pursuant to official municipal policy of some nature caused a constitutional tort"); *Piotrowski v. City of Houston,* 51 F.3d 512, 517 (5th Cir.1995) Neither the United States Supreme Court nor the Fifth Circuit have *ever* held that arms of the state (such as TEA) are subject to suit under § 1983.

▮ The only possible defendants for damages in a § 1983 suit are municipalities, counties, or individual capacity defendants who are "state actors." There are no individual capacity defendants in this suit.[16] Therefore, the Court finds that Plaintiff's causes of action for damages under 42 U.S.C. §§ 1981 and 1983 should be dismissed.

▮ In the alternative, the undersigned finds that Plaintiff's claims under 42 U.S.C. §§ 1981 and 1983 are barred because the claims, which involve discrimination, are properly brought only under Title VII. *Jackson v. City of Atlanta, Texas,* 73 F.3d 60, 63 (5th Cir.1996), *cert. filed,* 64 U.S.L.W. 3823 (June 4, 1996). In *Jackson,* the Court stated:

> Congress intended for Title VII—with its own substantive requirements, procedural rules, and remedies—to be the exclusive means by which an employee may pursue a discrimination claim. Allowing a plaintiff to state a discrimination claim under § 1983 would enable him to sidestep the detailed and specific provisions of "Title VII." *Id.*

With respect to the § 1981 claim, § 1981 affords no greater protection than Title VII: the elements of substantive claims of employment discrimination are the same under both statutes. *Page v. United States Indus., Inc.,* 726 F.2d 1038, 1041 n. 2 (5th Cir.1984). The Fifth Circuit has stated that where the plaintiff has alleged violations of both Title VII and § 1981, the Court, as a rule, will consider the claim under § 1981 only if violation of that statute can be made out on grounds different from those available under Title VII. *Johnston v. Harris County Flood Control Dist.,* 869 F.2d 1565, 1575 (5th Cir.1989), *cert. denied,* 493 U.S. 1019, 110 S.Ct. 718, 107 L.Ed.2d 738 (1990); *Rivera v. City of Wichita Falls,* 665 F.2d 531, 534 n. 4 (5th Cir. 1982).

In the present case, Plaintiff has failed to identify any distinction between her §§ 1981 and 1983 claims and her Title VII claim. For the foregoing reasons, Plaintiff's claims for damages under 42 U.S.C. §§ 1981 and 1983 will be dismissed.

wrongful and unauthorized acts are not suits against the state and a federal court's injunction against such wrongful acts is not a judgment against the state itself. *Brennan v. Stewart,* 834 F.2d 1248, 1252 (5th Cir.1988).

**16.** A defense of qualified immunity would be available to such a defendant. State actors are entitled to the defense of qualified immunity unless they violated clearly established rights of which a reasonable official would have known. *Hale v. Townley,* 45 F.3d 914, 917 (5th Cir.1995).

The Fifth Circuit recognizes that "the denial of some meritorious claims is the direct product of the immunity doctrine, which weighed these losses when it struck the policy balance." *Wicks v. Mississippi State Employment Services,* 41 F.3d 991, 997 (5th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 2555, 132 L.Ed.2d 809 (1995). There is no evidence in this case that either Commissioner violated clearly established law (at least as enunciated prior to *Hopwood*).

2. Plaintiff's Request for Injunctive Relief.

██ Pursuant to *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the sole exception to Eleventh Amendment immunity for states and official capacity state defendants is prospective injunctive relief. *See Ganther v. Ingle,* 75 F.3d 207, 209–210 (5th Cir.1996); *Tonkawa Tribe of Oklahoma v. Richards,* 75 F.3d 1039, 1048 (5th Cir. 1996); *Saahir v. Estelle,* 47 F.3d 758, 760–61 (5th Cir.1995). The essential ingredients of the *Ex parte Young* doctrine are that a suit must be brought against individual persons in their official capacities as agents of the state and the relief sought must be declaratory or injunctive in nature and prospective in effect.

██ Plaintiff has left TEA. Although Plaintiff requests reinstatement, she adds a proviso that this reinstatement will be acceptable only if she is offered the position of coordinator and given a concomitant raise. Because this Court does not find that Plaintiff was entitled to the promotion, this possibility is not available. Because Plaintiff does not request merely reinstatement to her old position, prospective declaratory or injunctive relief in her favor is moot. *See Wallace v. Texas Tech,* 80 F.3d 1042, 1047 n. 3 (5th Cir.1996).[17] For that reason, Plaintiff's request for injunctive relief under § 1983 will be dismissed.

### B. Plaintiff's Facial Challenge to the AAPs under Title VII.

The Supreme Court has determined that in certain circumstances, an employer may voluntarily establish an affirmative action plan without violating Title VII. *United Steelworkers v. Weber,* 443 U.S. 193, 197, 99 S.Ct. 2721, 2724, 61 L.Ed.2d 480 (1979). Under *Weber,* an employer's voluntary affirmative action plan is not a violation of Title VII if (1) its purpose is similar to that of Title VII, namely to "break down old patterns" of discrimination; (2) the plan does not "unnecessarily trammel" the rights of those outside the group that it is designed to protect; and (3) it is designed to eliminate a manifest racial or sexual imbalance. *Id.* at 208, 99 S.Ct. at 2730; *Johnson v. Transportation Agency,* 480 U.S. 616, 628–31, 107 S.Ct. 1442, 1450–52, 94 L.Ed.2d 615 (1987).

[19–21] The burden of establishing that an employer's voluntary affirmative action plan violates Title VII is on the plaintiff: Once a plaintiff establishes a prima facie case that race or sex has been taken into account in an employer's employment decision, the burden shifts to the employer to articulate a nondiscriminatory rationale for its decision. The existence of an affirmative action plan provides such a rationale. If such a plan is articulated as the basis for the employer's decision, the burden shifts to the plaintiff to prove that the employer's justification is pretextual and the plan is invalid. *Johnson,* 480 U.S. at 626, 107 S.Ct. at 1449.

██ The Court notes that the evidence indicates that the AAPs in the present case were not designed to correct past discrimination,[18] nor is there at present a manifest

---

17. This Court notes that the *Wallace* Court undertook a balancing test for the plaintiff's § 1981 and § 1983 claims as well as claims asserted under Title VII. However, in *Wallace,* the § 1981 and § 1983 claims arose from an alleged violation of the First Amendment separable from the claim for discrimination asserted under Title VII. In contrast, in the present case the identical conduct forms the alleged violation of § 1981, § 1983, and Title VII.

18. As Justice O'Connor observes in the context of an employment discrimination case:

The imposition of a requirement that public employers make findings that they have engaged in illegal discrimination before they engage in affirmative action programs would severely undermine public employers' incentive to meet voluntarily their civil rights obligations. This result would clearly be at odds with this Court's and Congress' consistent emphasis on "the value of voluntary efforts to further the objectives of the law." The value of voluntary compliance is doubly important when it is a public employer that acts, both because of the example its voluntary assumption of responsibility sets and because the remediation of governmental discrimination is of unique importance . . .

This conclusion is consistent with our previous decisions recognizing the States' ability to take voluntary race-conscious action to achieve compliance with the law even in the absence of a specific finding of past discrimination. Indeed, our recognition of the responsible state actor's competency to take these steps is

racial or sexual imbalance. However, affirmative action plans are still required for all federal contractors. As. such, past discrimination and present imbalance cannot be a requirement for constitutionality.

After review of the most recent AAP (Plaintiff's Exhibit 21) and consideration of the AAP in light of recent precedent, including *Hopwood*, 78 F.3d at 932–962, the Court finds that, because the AAP focuses on **recruitment** of minorities for the applicant pool and expressly prohibits favoritism in the actual selection of the successful applicant, the AAP is facially constitutional. (*See, e.g.*, § I, § X(B), § XI, § XII).

While there is evidence that in the past, race and gender were a factor in **selection** of the successful applicant, there is no evidence that such is still the case at present.[19] There is evidence that supervisors are encouraged to increase the diversity of the applicant pool. However, this encouragement does not rise to an unconstitutional level. As such, the Court finds that Plaintiff's facial challenge to the AAP must be dismissed.

### C. Plaintiff's Challenge to the AAPs as Applied to Her.

The shifting burdens analysis for Title VII claims is well known. *See e.g., St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Brown v. CSC Logic*, 82 F.3d 651, 654 (5th Cir.1996).

In order to make out a *prima facie* case of discrimination, a plaintiff must show (1) that she is a member of a protected group; (2) that she was qualified for the job that she held; (3) that she suffered adverse action; and (4) individuals outside her protected group did not suffer the adverse action. *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 992 (5th Cir.1996) (en banc); *Singh v. Shoney's, Inc.*, 64 F.3d 217, 219 (5th Cir. 1995). Once the plaintiff establishes a *prima facie* case, the defendant bears the burden of producing evidence that its employment decision was based on a legitimate, non-discriminatory reason. *See St. Mary's Honor Center*, 509 U.S. at 508–09, 113 S.Ct. at 2748 (By producing evidence, whether ultimately persuasive or not, of non-discriminatory reasons, petitioners sustained their burden of production). The burden then shifts back to the plaintiff to prove that the defendant "intentionally discriminated" against the plaintiff on the basis of a prohibited factor and that the reason proffered was a pretext *for discrimination. St. Mary's Honor Center*, 509 U.S. at 515–17, 113 S.Ct. at 2752–54; *Atkinson v. Denton Publishing Co.*, 84 F.3d 144, 149 (5th Cir.1996); *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 957 (5th Cir.1993).

A defendant is not required to prove the absence of a discriminatory motive. *Burdine*, 450 U.S. at 253–56, 101 S.Ct. at 1093–95. Rather, the plaintiff has "the ultimate burden of proving the critical element of discriminatory motive." *Ray v. Tandem Computers*, 63 F.3d 429, 433 (5th Cir.1995), *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 334 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). "Title VII

assumed in our recognition of the States' constitutional duty to take affirmative steps to eliminate the continuing effects of past unconstitutional discrimination.
*Wygant v. Jackson Bd. of Education*, 476 U.S. 267, 290–91, 106 S.Ct. 1842, 1855–56, 90 L.Ed.2d 260 (1986) (citations omitted, emphasis in original).

**19.** Given that affirmative action has succeeded at this agency, the Court surmises that, under *Hopwood* and using strict scrutiny, any future use of race or gender as a factor in an actual hiring decision would be unconstitutional. The Court does not reach this issue, however, because "courts have a strong duty to avoid constitutional

issues that need not be resolved in order to determine the rights of the parties to the case under consideration." *County Court of Ulster County v. Allen*, 442 U.S. 140, 154, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979); *United States v. Mendiola*, 42 F.3d 259, 260 n. 1 (5th Cir.1994).

The Court notes, however, that TEA's use of "utilization reports" is arguably coercive with respect to hiring decisions and, as such, implicates *Hopwood*'s prohibitions. While the Court does not reach this issue, the Court is disturbed that the continued use of utilization reports may create gender or racial preferences in hiring decisions, which is clearly impermissible under Supreme Court precedent and under *Hopwood*.

does not exist to punish poor management skills; rather it exists to eliminate certain types of bias in the workplace." *Ray v. Tandem,* 63 F.3d at 435 n. 19.

Plaintiff alleges that she encountered three separable adverse employment actions as a result of her race and gender, two related to lost promotions[20] and one related to her salary in comparison to minorities at the same level. These claims are addressed in turn as follows:

### 1. The 1992 Promotion.

First, Plaintiff alleges that she was not considered for the new position of Coordinator in early 1992 because she was a white woman. Defendant asserts that this claim is barred because the only charge filed by Plaintiff was filed more than three hundred days after she had notice of the promotion and, regardless, the EEOC charge which she did file did not mention the 1992 promotion.

■ It is well established that compliance with the administrative review apparatus provided by Title VII is ordinarily a requisite for judicial review of a discrimination claim. *See Gottlieb v. Tulane University of Louisiana,* 809 F.2d 278, 284 n. 8 (5th Cir.1987). It is required that a plaintiff file a charge of discrimination with the EEOC no more than three hundred days[21] after she knew of the adverse employment action. The three hundred day notification requirement is intended to promote the speedy, informal, non-judicial resolution of the discrimination claims, and to preserve evidence and records relating to the alleged discriminatory action. *Love v. Pullman Co.,* 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972); *Edwards v. Kaiser Aluminum & Chemical Sales, Inc.,* 515 F.2d 1195 (5th Cir.1975).

■ The operative date from which the 300 day period begins to run is the date of notice of adverse action. *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980); *Clark v. Resistoflex Co. Div. of Unidynamics,* 854 F.2d 762 (5th Cir.1988). Determination of when notice has been communicated to an employee is based on an objective standard, focusing upon when the employee knew, or reasonably should have known, that the decision to not hire him had been made. *See McWilliams v. Escambia,* 658 F.2d 326 (5th Cir.1981).

■ In the present case, Plaintiff had notice of the first failure to promote her more than three hundred days before she filed her charge of discrimination. Although Plaintiff asserts a "continuing violation," there is no evidence connecting the two discrete employment decisions. Plaintiff has therefore failed to carry her burden to rebut Defendant's allegation that Plaintiff's 1992 promotion claim is time-barred.

■ In addition, Plaintiff does not specifically mention the 1992 promotion decision in her charge. A Title VII cause of action may be based, not only upon the specific complaints made by the employee's initial EEOC charge, but also upon any kind of discrimination like or related to the charge's allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination. *Fine v. GAF Chemical Corp.,* 995 F.2d 576, 578 (5th Cir.1993). The Court does not believe that Plaintiff's charge of discrimination related to the 1993 promotion, on the facts of this case, could cause an investigation of an unrelated promotion decision made almost two years earlier.

For the foregoing reasons, the Court finds that dismissal of the claim related to the first promotion decision is proper.

### 2. The December, 1993 Promotion.

The Court has reviewed the evidence proffered by Plaintiff with respect to the filing of

---

**20.** Both promotion decisions occurred in late December of the relevant years and the promotions may not have actually occurred until January. This has caused some confusion as to the relevant dates. The Court refers to the first promotion as the "1992 promotion" because Plaintiff apparently did not became aware of it until January of 1992. Because the Plaintiff was aware of the December, 1993 promotion in December of 1993, the Court refers to the second promotion as the "1993 promotion."

**21.** Texas is a "referral state" because of the co-existent potential to file a charge with the Texas Commission on Human Rights. As such, the deadline to file a charge with either the EEOC or the TCHR is extended from 180 to 300 days.

her EEOC complaint on the 1993 promotion decision and finds that, at a minimum, she has raised a fact issue with respect to the timeliness of the filing. For that reason, the Court analyzes the claim on the merits.

■ Based upon *St. Mary's Honor Center*, for Plaintiff to succeed on her race or gender discrimination claims, she must offer evidence both that she was the best-qualified candidate for the positions of assistant supervisor and supervisor and that her race or gender was the "real reason" she was not promoted. 509 U.S. at 515–16, 113 S.Ct. at 2752–53.

Assuming, without deciding, that Plaintiff has made her *prima facie* case, Defendants have proffered evidence that Bill Monroe, a white male, was the most qualified applicant. Contrary to Plaintiff's supposition [22] that different interview panels skewed the selection process against her, the evidence, even viewed in the light most favorable to Plaintiff, clearly indicates that the same three-member panel (which included a female and a minority) interviewed all four finalists for the position. Because Mr. Monroe scored the highest in objective questioning, the panel recommended that Mr. Monroe be hired if his references "checked out." Because those references supported Mr. Monroe's selection, he was offered the position. Plaintiff has proffered no evidence to rebut Defendants' assertions.

■ Although Plaintiff alleges that Mr. Monroe was not in actuality as qualified as the evidence before the TEA indicated, that fact does not render his selection discriminatory. "The question is not whether the employer made an erroneous decision; it is whether the decision was made with discriminatory motive." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir.1995). Even viewed in the light most favorable to Plaintiff, there is no evidence that TEA's decision was motivated by gender discrimination.

The Court has reviewed the evidence before TEA as to Mr. Monroe's qualifications and finds that they were more than adequate

to support Mr. Monroe's selection. Defendants have therefore provided specific reasons why Mr. Monroe was selected over Ms. Messer, and those reasons are not connected to Mr. Monroe's gender. Plaintiff has failed to provide any facts which might show that the nondiscriminatory reasons proffered by Defendants are pretexts for gender discrimination. For that reason, the Court finds that Plaintiff's cause of action related to the 1993 promotion should be dismissed.

3. The Disparity in Salaries.

■ Plaintiff also complains that four minority directors in identical positions as she received more compensation for comparable work. Defendants have responded that the senior directors were recruited from outside TEA and three of the four directors took significant pay cuts to come to work at TEA, while the fourth received a minimal raise. The Court has reviewed the applications and backgrounds of the minority senior directors and determines that, even viewed in the light most favorable to Plaintiff, these directors were qualified for their positions. As such, Defendants' argument that they needed to offer a higher salary to "lure" them to TEA is credible. Defendants assert, and Ms. Messer does not dispute, that TEA did not need to offer a higher salary to Ms. Messer because she was a long-time employee of TEA and thus did not need to be "lured" into coming to work at TEA as a senior director. The Court notes that the position of senior director was a promotion for Plaintiff and was not a "promotion" for at least three of the four minority directors.

Plaintiff has failed to offer any facts which might indicate that the minority directors' salaries were based, not on their accomplishments, but on their skin color. For that reason, the Court finds that Plaintiff's cause of action for the salary differential should be dismissed.

D. *Plaintiff's Title VII Retaliation Cause of Action.*

■ Section 704(a) of Title VII, 42 U.S.C. s 2000e–3(a), provides protection

---

22. Plaintiff does not affirmatively aver that there were different interview panel, she merely "thinks" or "heard" that there were different panels. The evidence clearly shows otherwise.

against retaliation for employees who oppose unlawful employment practices committed by an employer and for employees who participate in Title VII proceedings.[23] A showing of three elements is required in order to make out a *prima facie* case of retaliation: (1) the plaintiff engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) there was a causal connection between the participation in the protected activity and the adverse employment action. *Dollis v. Rubin,* 77 F.3d 777, 781 (5th Cir.1995); *Barrow v. New Orleans S.S. Ass'n,* 10 F.3d 292, 298 (5th Cir.1994); *Collins v. Baptist Memorial Geriatric Center,* 937 F.2d 190, 192 (5th Cir.), *cert. denied,* 502 U.S. 1072, 112 S.Ct. 968, 117 L.Ed.2d 133 (1992).

▮ The Court agrees that Plaintiff engaged in protected activity. However, the Court finds that, with respect to most of Plaintiff's complaints and the requirement of "adverse employment action," Plaintiff fails to carry her burden. "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Dollis,* 77 F.3d at 781–82, *citing Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.) (en banc) (noting that Title VII discrimination cases have focused upon ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating), *cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981).

In *Dollis,* the Fifth Circuit recently held that the Plaintiff's complaints were properly disposed of on summary judgment because they did not rise to the level of "ultimate employment decisions." *Id.* at 782. Although Ms. Dollis engaged in protected activity, the Court found that she was not fired, demoted, denied leave, denied a promotion, or made the subject of any other employment decision as a result of her activity and thus summary judgment on her claims was appropriate. Even if a plaintiff receives a poor performance evaluation, in *Gustovich v. AT & T Communications, Inc.,* 972 F.2d 845, 847 (7th Cir.1992), the court held that "[t]here is nothing to complain about until a poor [performance] rating carries or directly portends a loss of job or pay." *Id., see also Hopkins v. Baltimore Gas & Elec. Co.,* 871 F.Supp. 822, 826 n. 5, 836 (D.Md.1994) (salary increases and benefits "were not adversely affected in any way by performance appraisal" that plaintiff believed was too low; he failed to show that appraisal or other employer conduct constituted reprisal for protected activity because none of the alleged retaliatory acts were "adverse employment actions.")

▮ Similarly, in the case at bar, Plaintiff has failed to show that, other than for her downsizing claim, she suffered any adverse "ultimate employment decision."[24] As such, Plaintiff fails to carry her *prima facie* burden with respect to all but one of her retaliation claims.[25]

However, the Court finds that the allegation that Plaintiff's division was reduced twenty percent (20%) in retaliation arguably satisfies her *prima facie* burden. If a plaintiff satisfies her *prima facie* burden, a defendant must come forward with a non-discriminatory reason for its actions, which the plaintiff must then rebut to survive summary judgment. *Ray v. Iuka Special Mun. Separate Sch. Dist.,* 51 F.3d 1246, 1249 (5th Cir. 1995).

▮ Defendants have proffered a legitimate reason for the division's downsizing, specifically that TEA agency-wide was undergoing a significant decrease in size relat-

---

23. This section provides:
   It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice and made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Title.

24. Indeed, Plaintiff received a raise after she engaged in protected activity.

25. The Court notes that although Plaintiff complains about the termination of other TEA employees, she has no standing to complain about alleged retaliation experienced by other TEA employees.

ed to funding and the TEA budget. Plaintiff has failed to provide any evidence which might indicate that her division was singled out in retaliation for her protected activity. As such, the Court finds that Plaintiff has failed to rebut the legitimate, non-discriminatory reason proffered by Defendants.

For the foregoing reasons, the Court finds that Plaintiff's retaliation claims under Title VII should be dismissed.

### E. Plaintiff's State Law Claims.

██ Plaintiff also amended her complaint after removal to add a pendent state law claim for breach of contract, related to the promise by Dr. Meno to raise her salary to that of the other (minority) directors.[26] Although Plaintiff did eventually receive a raise, she alleges that this raise was "too little, too late." Defendants respond that sovereign immunity bars Plaintiff's recovery for breach of contract, requiring dismissal of the claim.

██ "From the earliest days of statehood, under the doctrine of governmental immunity, persons aggrieved by an action of the State or of one of its agencies have been unable to sue the State without its permission." *Barcroft v. State of Texas,* 900 S.W.2d 370, 371 (Tex.App—Texarkana 1995, no writ), *citing Hosner v. De Young,* 1 Tex. 764, 769 (1847). That rule prevails today. *Liberty Mutual Ins. Co. v. Sharp,* 874 S.W.2d 736 (Tex.App.—Austin 1994, writ denied); *Dillard v. Austin Indep. Sch. Dist.,* 806 S.W.2d 589, 592 (Tex.App.—Austin 1991, writ denied). Moreover, the State is immune from suit without its consent, even if there is no dispute regarding its liability. *Green International, Inc. v. State,* 877 S.W.2d 428, 432 (Tex.App.—Austin 1994, writ dism'd by agr.).

██ With respect to Plaintiff's specific claims, the State, including a state agency such as TEA, is not liable for breach of contract absent consent to suit. *Lowe v.*

*Texas Tech Univ.,* 540 S.W.2d 297, 298 (Tex. 1976); *Pickell v. Brooks,* 846 S.W.2d 421, 424–26 (Tex.App.—Austin 1992, no writ); *Dillard v. Austin Indep. Sch. Dist.,* 806 S.W.2d 589, 592–93 (Tex.App.—Austin 1991, writ denied); *Courtney v. University of Texas Sys.,* 806 S.W.2d 277, 284 (Tex.App.—Fort Worth 1991, writ denied). While the State waives its immunity **from liability** when it contracts, *Fristoe v. Blum,* 92 Tex. 76, 45 S.W. 998, 999 (1898), the State retains its immunity **from suit.** *W.D. Haden Co. v. Dodgen,* 158 Tex. 74, 308 S.W.2d 838, 842 (1958); *Alcorn v. Vaksman,* 877 S.W.2d 390, 403 (Tex.App.—Houston [1st Dist.] 1994 *en banc,* writ denied); *State v. Elliott,* 212 S.W. 695, 698–701 (Tex.Civ.App.—Galveston 1919, writ ref'd). Recovery of money damages against the State without its consent in a "pure" contract case is not permitted. *Courtney,* 806 S.W.2d at 281–82.

██ The State may consent to suit by enacting a statute that waives immunity or by passing a legislative resolution. Absent an allegation that the State has consented to be sued, the trial court lacks jurisdiction over breach of contract claims. *Green,* 877 S.W.2d at 433.

██ Once a state consents, it is liable under contract law the same as anyone else. Here, the State never consented to be sued. It is uncontested that Plaintiff has not received permission from the state legislature to sue the state. As such, her state law claims against TEA and the official capacity defendants [27] must be dismissed.

## V. SUMMARY OF FINDINGS

The Court determines as follows:

1. Plaintiff's claims under 42 U.S.C. § 1981 should be dismissed as repetitive of the claims asserted under Title VII;

---

26. Because of the posture of this case, the Court presumes that Dr. Meno did promise Ms. Messer a salary raise. The Court also assumes, *arguendo,* that this promise was a "contract."

27. When state officials are sued for acts they performed in their official capacities, as in the

case at bar, the suit is against the state and state sovereign immunity applies. *Alcorn,* 877 S.W.2d at 403, *citing Director of the Department of Agriculture and Environment v. Printing Indus. Ass'n,* 600 S.W.2d 264, 266, 270 (Tex.1980).

2. Plaintiff's claim for damages under 42 U.S.C. § 1983 should be dismissed based on sovereign immunity;

3. Plaintiff's claim for prospective injunctive relief under 42 U.S.C. § 1983 should be dismissed as moot;

4. Plaintiff's Title VII cause of action related to the 1992 promotion decision should be dismissed as time-barred and as not arising within the scope of the EEOC charge;

5. Plaintiff's Title VII cause of action related to the 1993 promotion decision should be dismissed because Plaintiff failed to rebut Defendants' legitimate, non-discriminatory reason;

6. Plaintiff's Title VII cause of action for retaliation (aside from the claim for reduction of her division) should be dismissed for failing to show a *prima facie* case of adverse employment action;

7. Plaintiff's Title VII cause of action for retaliation for reduction of her division should be dismissed for failing to rebut Defendants' legitimate, non-discriminatory reason; and

8. Plaintiff's state law claims of breach of contract should be dismissed because she has failed to surmount the State's immunity from suit.

## VI. CONCLUSION

As recited above, all of Plaintiff's claims have been dismissed pursuant to various rulings on the motions for summary judgment.